UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES SMITH,<br><br>                    Plaintiff,<br><br>         v.<br><br>CITY OF LODI, et al.,<br><br>                    Defendants. | No. 2:14-cv-01318-TLN-AC<br><br>**ORDER DENYING SUMMARY JUDGMENT** |

This matter is before the Court pursuant to Plaintiff James Smith's ("Plaintiff") Motion for Summary Judgment (ECF No. 27) and Defendant City of Lodi's ("Defendant") Cross Motion for Summary Judgment (ECF No. 28). Both parties oppose the others' motions, (*see* ECF Nos. 29 & 30), and have respectively filed replies (*see* ECF Nos. 31 & 35). The Court has carefully considered the arguments raised by the parties, and for the reasons set forth below, hereby DENIES Plaintiff's Motion for Summary Judgment and DENIES Defendant's Cross Motion for Summary Judgment.

**I.     FACTUAL BACKGROUND**

Plaintiff suffers from multiple disabilities including arthritis, fibromyalgia, and diabetes. (Def's Response to Pl's Separate Statement of Undisputed Material Facts ("UMF"), ECF No. 29-1, UMF 1.) He also has metal prosthetics in his leg and requires a walker for mobility. (ECF No. 29-1, UMF 1.) He cannot walk long distances because of his disability, and he sometimes uses a

1    wheelchair. (ECF No. 29-1, UMF 1.) Defendant is, and at all times relevant to herein was, a
2    public entity within the means of Title II of the Americans with Disabilities Act ("ADA"). (ECF
3    No. 29-1, UMF 2.) Defendant owned, operated, controlled, maintained and exercised dominion
4    over the facility known as the Lodi Grape Bowl Stadium ("Grape Bowl") located in the City of
5    Lodi, California. (ECF No. 29-1, UMF 3.)   The Grape Bowl is a historic building that was
6    originally built in approximately 1940. (ECF No. 29-1, UMF 6.) The Grape Bowl topography is
7    formed by 2 earth berms on the North and South side of the field. (ECF No. 29-1, UMF 7.)
8    Beginning in approximately 2010, Defendant began a series of renovations that included
9    installation of a new scoreboard and sound system, upgraded lighting, installation of synthetic
10   turf, and significant alterations to the south side of the stadium, including new ramps, seating, and
11   parking stalls. (ECF No. 29-1, UMF 9.) Pedestrian entry to the Grape Bowl is from Stockton
12   Street on the West side; public restrooms, a ticket window, and a concession stand are provided in
13   a common building just inside the pedestrian entrance. (ECF No. 29-1, UMF 8.) Defendant has
14   spent between three and five million dollars on the alterations. (ECF No. 29-1, UMF 10.)
15   Defendant asserts that these renovations were completed in 2013 and that the alterations are ADA
16   compliant. (Def's P&A in Supp. of Summ. J., ECF No. 28-1 at 8.)
17        The facility is rented out by local high schools for sporting events. (ECF No. 29-1, UMF
18   3.) Lodi High School and Tokay High School use the Grape Bowl for their home football games,
19   and their fans sit on the South side of the stadium. (ECF No. 29-1, UMF 12.) During high school
20   football games, the North side of the stadium is primarily used by the visiting team and their
21   supporters. (ECF No. 29-1, UMF 12.) Mr. Smith has visited the Grape Bowl an estimated eight
22   times since 2010. (Defs' Statement of Material Facts ("SUF"), ECF No. 28-2, SUF 3.) One
23   specific visit was a football game between Amos Alonzo Stagg High School and Lodi High
24   School on or about September 20, 2013. (ECF No. 29-1, UMF 17.) When Amos Alonzo Stagg
25   High School plays at the Grape Bowl, it is considered the visiting team, and thus the team and its
26   supporters sit on the north side of the stadium. (ECF No. 29-1, UMF 18.) Plaintiff asserts that it
27   is "significant and meaningful" for him "to be able to sit with his alma mater's team." (ECF No.
28   27-1 at 3.) Plaintiff also alleges that he would like to return to the Grape Bowl, but that he is

currently prevented from doing so by ADA violations concerning the North side seating, parking and paths of travel as well as the South side paths of travel.  (First Am. Compl. ("FAC"), ECF No 17 at ¶ 20.)

Plaintiff filed the instant complaint alleging violations of Title II of the Americans with Disabilities Act (ADA); Unruh Civil Rights Act California Civil Code § 51 et seq.; and the California Disabled Persons Act California Civil Code § 54 et seq ("CPDA").  (ECF No. 17.)  Plaintiff has filed a motion for summary judgment seeking: (1) judgment in favor of Plaintiff that there was a violation of the ADA; (2) judgment in favor of Plaintiff that there was a violation of the Unruh Civil Rights Act; and (3) injunctive relief.  (ECF No. 27.)  Defendants have filed a cross motion for summary judgment asserting that the facility is ADA compliant and thus it is owed judgment as to all Plaintiff's claims.  (ECF No. 28-1.)

## II.     LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates no genuine issue as to any material fact exists, and therefore, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file."  *Id.* at 324 (internal quotations omitted).  Indeed, summary judgment should be entered against a party who does not make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities*

*Serv. Co.*, 391 U.S. 253, 288–89 (1968).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 251–52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *First Nat'l Bank*, 391 U.S. at 288–89.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits.  Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982).  The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the opposing party.  *Anderson*, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).  Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id.* at 587.

///

### III. ANALYSIS

Plaintiff moves for summary judgment on his ADA and Unruh Civil Rights Act claims as well as injunctive relief. (ECF No. 27.) Defendant has filed a cross-motion for summary judgment as to each of Plaintiff's claims. (ECF No. 28.) The Court will first addresses the ADA standard and then each of Plaintiff's ADA allegations; the Court will then address Plaintiff's Unruh and CPDA claims.

A. The Americans With Disabilities Act (ADA)

   *i.    Title II Requirements*

The ADA, which was signed into law on July 26, 1990, aims "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II regulates state and local governments operating public services or programs. Under Title II of the ADA, a "qualified individual with a disability" cannot, "by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* at § 12132.1. For a plaintiff to make out a prima facie case under Title II of the ADA, he or she must show that: "(1) [he] is an individual with a disability; (2) [he] is otherwise qualified to participate in or receive the benefit of a public entity's services, programs, or activities; (3) [he] was either excluded from participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits or discrimination was by reason of [his] disability." *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007).

"An individual is excluded from participation in or denied the benefits of a public program if 'a public entity's facilities are inaccessible to or unusable by individuals with disabilities.'" *Daubert v. Lindsay Unified Sch. Dist.*, 760 F.3d 982, 985 (9th Cir. 2014) (quoting 28 C.F.R. § 35.149). In defining accessibility, Title II's implementing regulations distinguish between newly constructed or altered facilities, which are covered by 28 C.F.R. § 35.151, and existing facilities, which are covered by 28 C.F.R. § 35.150. *Id.*

///

5

### ii. Existing Facilities

An existing structure or facility is defined as a facility constructed prior to January 26, 1992. *Daubert*, 760 F.3d at 986. The ADA standards for existing facilities provide that "a public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible and usable by individuals with disabilities." 28 C.F.R. § 35.150 (a)(1). "Title II's emphasis on 'program accessibility' rather than 'facilities accessibility' was intended to ensure broad access to public services, while, at the same time, providing public entities with the flexibility to choose how best to make access available." *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 6 (1st Cir. 2000). "'The overall policy of the ADA is to require relatively few changes to existing buildings, but to impose extensive design requirements when buildings are modified or replaced.'" *Anderson v. Pennsylvania Dep't of Pub. Welfare*, 1 F. Supp. 2d 456, 464 (E.D. Pa. 1998); (quoting *Coalition of Montanans Concerned with Disabilities v. Gallatin Airport Auth.*, 957 F. Supp. 1166, 1168 (D. Mont. 1997)).

### iii. New Construction and Altered Facilities

Section 35.151(a)(1) provides: "Each facility or part of a facility constructed by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities, if the construction was commenced after January 26, 1992." 28 C.F.R. § 35.151(a)(1). Because architectural barriers can be avoided at little or no cost during the construction or alteration of buildings, the provisions applicable to new construction and alterations do not provide an undue burden defense. *See Kinney v. Yerusalim*, 9 F.3d 1067, 1071 (3d Cir. 1993). Any alteration "that affects or could affect the usability of the facility," if commenced after the ADA's effective date, must "to the maximum extent feasible, be [made] **in such a manner that the altered portion of the facility** is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(b) (emphasis added). "To be 'readily accessible,' any part of a newly constructed or altered facility must be constructed in conformance with the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG), 28 C.F.R. Pt. 36, App. A, or with the Uniform Federal Accessibility Standards (UFAS), 41 C.F.R. Pt. 101–19.6, App. A." *Daubert*,

760 F.3d at 986 (citing 28 C.F.R. § 35.151(c)(1)–(3).

Alterations are defined as a "change in a building or facility that affects or could affect the usability of a building or facility or a portion thereof." (ADA Standards Section 202.3). Due to the changes in ADA requirements over time, the time of construction dictates which building guidelines the alteration must meet:

> If physical construction or alterations commence[d] after July 26, 1992, but prior to September 15, 2010, then new construction and alterations ... must comply with either UFAS or the 1991 [ADAAG].... If physical construction or alterations commence[d] on or after September 15, 2010 and before March 15, 2012, then new construction and alterations ... may comply with ... [t]he 2010 [ADAAG], UFAS, or the 1991 [ADAAG].... If physical construction or alterations commence[d] on or after March 15, 2012, then new construction and alterations ... shall comply with the 2010 [ADAAG].

28 C.F.R. § 35.151(c)(1)–(3).

### iv. The Grape Bowl

Here, the Grape Bowl was originally built in approximately 1940. (ECF No. 29-1, UMF 6.) Thus, for the purposes of ADA legislation it is deemed an existing facility since it was constructed prior to January 26, 1992. *See* 28 C.F.R. § 35.151(a)(1). However, any alterations made to the facility are required to meet the requirements governing the time frame of the alteration. Defendant provides that a transition plan was adopted by the City, which included plans to make the Grape Bowl compliant with the ADA.[1] (ECF No. 28-2, SUF 3.) Improvements were not made to the facility until 2010, when the City of Lodi embarked upon extensive projects to make the facility ADA compliant. (ECF No. 28-2, SUF 4.)

Defendants break the construction process into three phases. Phase I of the plan was contracted at $374,460.64 and consisted of the following: demolition of two restroom/concession stand buildings; miscellaneous other structures; concrete flat work; concrete footings; wood pole light standards; backfill of footings; site grading; installation of ADA seating and access for eight; and other incidental and related work. (ECF No. 28-2, SUF 5.) Phase II was contracted at

---

[1] Plaintiff disputes that the plan resulted in the Grape Bowl being ADA compliant. (Pl's Response to Def's SUF, ECF No. 30-2.)

1   $848,638.84 and consisted of the following: the installation of an all-weather playing field; new
2   steps and ramps from the field to the bleacher area; an 18 inch concrete curb; and a sidewalk path
3   of travel along the North[2] and South sides of the field and to the handicapped parking area.  (ECF
4   No. 28-2, SUF 6.)  Phase III was the most extensive at $1,635,164.41 and consisted of the
5   following: an ADA accessible ramp to the south-side upper concourse; ADA seating at the south-
6   side upper concourse; concrete plaza area; concession, restroom and ticket building; landscape;
7   and irrigation and other related facilities.[3]  (ECF No. 28-2, SUF 7.)  All three phases were
8   completed on or before August 22, 2013.  (ECF No. 28-2, SUF 7.)

      *v.*  *Plaintiff's Allegations*

   The fact that Plaintiff is disabled within the meaning of the statue and that Defendant is a public entity within the meaning of Title II of the ADA are undisputed.  (ECF No. 29-1, UMF 1–2.)  Furthermore, the parties do not dispute that Plaintiff is otherwise qualified to participate in or receive the benefit of a public entity's services, programs, or activities.  Thus, the matter before the Court concerns the third and fourth factors of whether Plaintiff was excluded from participation in Defendant's program and whether such exclusion was due to discriminatory barriers.  *See O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d at 1060.

   At the outset, the Court notes that Plaintiff's briefing applies the 1992 and 2010 ADAAG to the entirety of the Grape Bowl and asserts that failure to meet or exceed these guidelines results in a discriminatory barrier.  (ECF No. 27-1 at 12–13.)  Although these guidelines must be met by any alterations that occurred after January 26, 1992, they do not apply to existing structures.  Plaintiff has not provided this Court with any case law or statute to support the position that any alterations to an existing facility then ushers the facility as a whole under the 1992 or 2010 ADAAG requirements.  *See* 28 C.F.R. § 35.151(b) (Alterations commenced after the ADA's effective date, must "to the maximum extent feasible, be [made] in such a manner **that the altered portion of the facility is readily accessible** to and usable by individuals with disabilities.") (emphasis added).  Thus, the Court is required to apply the 2010 guidelines to any

---

[2] As discussed later in this Order, *see infra* Section III(v)(a), there is a dispute as to when and if the sidewalk path of travel along the North side of the field has been altered.
[3] Plaintiff disputes that ramps meet ADA requirements.  (Pl's Response to Def's SUF, ECF No. 30-2.)

alterations made after 2010 and apply the existing facility standards—also known as the "program accessibility" standard— to those parts of the Grape Bowl that have not been altered.

"In the context of existing facilities, discrimination includes "a failure to remove architectural barriers ... where such removal is readily achievable." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 945 (9th Cir. 2011) (citing 42 U.S.C. § 12182(b)(2)(A)(iv)). "[W]ith respect to existing facilities, a public entity need only provide program access, by 'operating each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.'" *Daubert*, 760 F.3d at 986 (quoting 28 C.F.R. § 35.150(a)). Even though existing facilities are subject to a lesser standard, mere physical access is not sufficient. Title II requires public entities to provide "meaningful access" to their programs and services. *See Lonberg v. City of Riverside*, 571 F.3d 846, 851 (9th Cir. 2009) ("[The] prohibition against discrimination is universally understood as a requirement to provide 'meaningful access.'"). Section 35.150(b)(1) provides a number of methods through which a public entity may achieve program access, including "any ... methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities." In deciding on the method for achieving program access, "a public entity shall give priority to those methods that offer services, programs, and activities to qualified individuals with disabilities in the most integrated setting appropriate." *Id.*

"'Title II's emphasis on "program accessibility" rather than "facilities accessibility" was intended to ensure broad access to public services, while, at the same time, providing public entities with the flexibility to choose how best to make access available.'" *Daubert*, 760 F.3d at 986 (quoting *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 6 (1st Cir. 2000)). "For this reason, the regulations emphasize that '[a] public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance.'" *Id.* (quoting 28 C.F.R. § 35.150(b)(1)). In discussing the matter, the Supreme Court has stated:

> [T]he reasonable modification requirement can be satisfied in a number of ways. . . .In the case of older facilities, for which structural change is likely to be more difficult, a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites . . .

9

> Only if these measures are ineffective in achieving accessibility is the public entity required to make reasonable structural changes. And in no event is the entity required to undertake measures that would impose an undue financial or administrative burden, threaten historic preservation interests, or effect a fundamental alteration in the nature of the service. §§ 35.150(a)(2), (a)(3).

*Tennessee v. Lane*, 541 U.S. 509, 532 (2004) (internal citations omitted).

With this framework in mind, the Court turns to the barriers alleged by Plaintiff.

### a. North Side Seating, Parking, and Paths of Travel

Plaintiff alleges that there are no wheelchair seats available on the North side of the stadium and only 14 seats available on the south side. (ECF No. 27-1 at 13.) Plaintiff asserts:

> [Americans with Disabilities Act Standards ("ADAS")] Section 221.2.1.1 requires that wheelchair seats be provided per Table 221.2.1.1. For an assembly area with more than 5,000 total seats, 36 wheelchair seats are required plus 1 wheelchair seat for each 200 additional seats over 5,000. Therefore, based upon a total seating capacity of 11,000 seats, at least 66 wheelchair seats plus adjacent companion seats should be provided at the Grape Bowl. The total Grape Bowl seating capacity is listed differently on the various documents obtained from the City, including one calculation for 6,808 seats. Assuming this is the correct quantity, 2010 ADAS requires 46 wheelchair seats plus the same number of companion seats. Therefore, the 14 wheelchair seats currently provided fall well short of compliance with the 2010 ADAS requirements.

(ECF No. 27-1 at 14.) Plaintiff also asserts that parking is deficient on the North side of the facility:

> While there are four apparently ADA-compliant parking spots servicing the south side of the Stadium, there are no comparable spots servicing the north seating area. Section 208.3.1 of the 2010 Americans with Disabilities Act Standards ("ADAS") requires that parking spaces serving a particular building or facility be on the shortest accessible route to the facility entrance.

(ECF No. 27-1 at 14.)

In response, Defendants argue that Plaintiff fails to apply the correct standard by analyzing the facility under the 1992 and 2010 standards instead of the existing facilities standard. This Court agrees.

Based on the evidence before this Court, the seating and parking on the North side of the facility have not been altered and thus fall under the existing facility framework. Although some

10

electrical work has been updated on the North side of the building,[4] Plaintiff has not presented this Court with case law to support that this upgrade requires all of the seating and parking on the North side of the facility to be altered in order to meet the 2010 ADA building requirements. Without case law to support this leap, the Court is unwilling to interpret the myriad of statutory provisions before it to mean that updating a facility's lighting requires the entire North side to be remodeled to current ADA standards.

In addition to opposing Plaintiff's motion for summary judgment, Defendant moves for summary judgment as to this allegation and assert that the Grape Bowl meets the program accessibility standard of an existing facility:

> the City provides ADA accessible disabled seating at the Grape Bowl at specific locations. Specifically, ADA seating exists on the south side of the stadium where disabled individuals have 'program access' for football games in their entirety. Although ADA improvements have not been completed on the north side of the Grape Bowl, the City does not have to follow the strict technical guidelines applicable to post-1992 facilities under 28 CFR §35.151 on the north side of the Grape Bowl in order to be compliant with the ADA.

(ECF No. 28-1 at 8.)

This Court finds the Ninth Circuit's recent opinion, *Daubert v. Lindsay Unified School District*, 760 F.3d 982 (9th Cir. 2014), instructive on this matter. In *Daubert*, the plaintiff required the use of a wheelchair and sued the defendant school district claiming ADA discrimination based on seating at the school's football field. *Id.* The bleachers at the Lindsay High School football field were constructed in 1971, and have never been reconstructed or altered. *Id.* at 984.

> Spectators who use wheelchairs regularly attend Lindsay High School football games. According to both parties, such spectators are able to attend games with companions, and enjoy unobstructed views from the following locations: (1) in front of the south-side

---

[4] Based on the Grape Bowl Diagram provided by Plaintiff, the alterations that have been made to the North side of the facility are limited to the following: Northwest light tower- (10) 1500 W MZ Musco luntinaries/ 100 AMP main breaker at base of tower/lights installed: May 2009 - Bleyco Electric; North middle light tower- (9) 1500 WMZ Musco luminaries/100 AMP main breaker at base of tower/lights installed: May 2009 - Bleyco Electric; 1000 AMP main switch board cabinet with breakers (Feeds only north side); North Musco control-link controller for north side sports lighting mounted to west side of 1000 AMP cabinet; and Northeast light tower- (10) 1500 W MZ Musco luminaries/ 100 AMP main breaker at base of tower/lights installed: May 2009 - Bleyco Electric. (*See* Grape Bowl Diagram, ECF No. 27-15.)

11

> bleachers between the thirty and forty-yard lines; (2) the southwest corner of the field, and (3) the end zone on the east side of the field. The parties also agree that the end zone on the east side of the field is near a concession stand, and that spectators tend to congregate in this area to watch games.

*Id.* The plaintiff alleged discrimination because he "'could not fully enjoy' the games because he 'had an inferior view of the field and had to deal with either looking through a gate, or folks periodically walking in front of [him], or players and coaches standing on the sidelines obscuring [his] view of the play.'" *Id.* The plaintiff also argued that the wheelchair-accessible areas were "not satisfactory," because they did not compare in quality and convenience to the elevated stadium-style seating," and did not allow him to sit with other fans. *Id.* at 985.

The Ninth Circuit held that the defendant had met Title II's program accessibility requirement: "Football games at the Lindsay High School football stadium are 'readily accessible' to individuals who use wheelchairs. *See* 28 C.F.R. § 35.150(a). The School District offers many different locations from which spectators who use wheelchairs are able to view football games, and it is undisputed that such spectators enjoy unobstructed views from at least three of these locations." *Id.* at 988. The same analysis applies to the instant matter.

Under 28 C.F.R. § 35.150(a), the City provides "program access" on the South side of the stadium where disabled guests are provided with parking and seating to watch a football game in its entirety, which is sufficient under *Daubert*. The fact that Mr. Smith traveled to the North side of the Grape Bowl to have the experience of sitting with the visiting team did not establish an ADA violation. The crux of Plaintiff's arguments is that "program access" is more than just the ability to watch the football game at the stadium, but the ability to have access to his desired area of the stadium. Although the Court is sympathetic to Plaintiff's circumstances, it does not agree with Plaintiff's interpretation of the law. The mere fact that an existing facility does not comply with the ADAAG, does not render the program inaccessible. "[A]ssessing a program's accessibility is a subjective evaluation that entails viewing the program in its entirety. *Daubert v. Lindsay Unified Sch. Dist.*, No. 1:09-CV-1463 GSA, 2012 WL 1593968, at *8 (E.D. Cal. May 4, 2012), aff'd, 760 F.3d 982 (9th Cir. 2014) [hereinafter *Daubert I*]. As the lower court stated in *Daubert I*:

12

> The football game is the program offered, not the seating. The seating is part of the facility. Plaintiff's approach would render the "program access" standard meaningless because it would require that public entities modify existing facilities whenever the general public seating area was not accessible or ADAAG compliant. These required structural modifications for existing facilities is what Congress meant to avoid when it created different standards for facilities built or modified before and after the enactment of the ADA. *Greer v. Richardson Independent School District*, 2012 WL 833367 * 6 (5th Cir. March 14, 2012).

*Id.* at *8. This policy is articulated in the ADA Technical Assistance Manual at section 5.2000 which states:

> Unlike private entities under Title III, public entities are not required to remove barriers from each facility, even if removal is readily achievable. A public entity must make its "programs" accessible. Physical changes to a building are only required when there is no other feasible way to make the program accessible.

Department of Justice, Technical Assistance Manual to Title II of the ADA, (1994) § 5.2000 available at http://www.ada.gov/taman2.html#II-5.2000. The program—the viewing of the football game—was accessible in its entirety on the South side of the Grape Bowl. Thus, Defendant's failure to provide wheelchair seating and parking on the North side of the stadium does not constitute an ADA violation. Thus, if Plaintiff's ADA claims rested solely on this basis for relief granting Defendant's summary judgment motion would be appropriate. However, as discussed below, Plaintiff has articulated other factual grounds in support of his ADA claim which cannot be resolved via summary judgment.

Plaintiff has alleged that he encountered architectural barriers in the path of travel to the North side of the facility. (ECF No. 27-1 at 15.) The Court has been supplied with contradicting information. Throughout the briefing, Defendant has not identified any alterations made concerning the pathways on the North side of the building. In fact the diagram presented to the Court that details the location of improvements does not show any such alteration to the North side ramp. (*See* ECF No. 27-15.) Furthermore, in Defendant's Response to Plaintiff's Statement of Undisputed Facts, Defendant states that it is undisputed that "No alterations have been made to the seating, paths of travel, or parking that services the north side of the stadium since 2009."

1  (ECF No. 29-1, UMF 11.)  However, the declaration of Jeff Hood, the Parks, Recreation, and
2  Cultural Services Director of the City of Lodi,[5] seems to contradict that position: "Phase II
3  consisted of the installation of an all-weather playing field, new steps and ramps from the field to
4  the bleacher area, an 18 inch concrete curb, and a sidewalk path of travel along the north and
5  south sides of the field and to the handicapped parking area."  (Hood Decl., ECF No. 29-2 at ¶4.)
6  As this creates a material issue of fact as to whether this alteration was in fact made and if so
7  whether it was constructed according to the applicable regulations, the Court cannot grant
8  summary judgment as to this matter.  Thus, the Court turns to whether Plaintiff has shown ADA
9  violations concerning the South side of the facility.

b. South Side Paths of Travel

At the outset, Defendant argues that Plaintiff does not have standing to assert violations as to the South side of the facility because Plaintiff did not allege that his injury was caused by any barrier on the South side of the Stadium: "Plaintiff argues that he has not returned to the Grape Bowl because the North side is not accessible.  He does not aver that he did not visit the stadium due to any alleged barrier on the South side, therefore he lacks standing under the *Pickern* test."  (ECF No. 29 at 6.)

In opposition, Plaintiff asserts that he:

> is not seeking a fix of the south side.  The noncompliance of the south side is relevant to overall programmatic access.  The Defendant cannot on one hand point to the south side, label it accessible, and claim it offers programmatic access, and then on the other hand argue barriers to access present on the south side cannot be raised in this case.

(ECF No. 31 at 3.)  This Court agrees.  Thus, the Court turns to the alleged violations.

Plaintiff asserts that the paths of travel on the South side of the Stadium are not ADA compliant.  (ECF No. 27-1 at 15.)  Specifically, Plaintiff alleges that the concrete ramp that leads from the Southwest side of the Stadium to the upper concourse of the South seating side requires edge protection along the sides pursuant to the 2010 ADAS Section 405.9.  (ECF No. 27-1 at 15.)  Plaintiff contends that this can be rectified by welding on a metal plate to the inside face of the

---

[5] Mr. Hood's declaration was filed with Defendant's opposition to Plaintiff's motion for summary judgment.

1  noncompliant portions of the handrail and that the cost would range close to $50 per linear foot
2  plus labor.  (ECF No. 27-1 at 15.)   Plaintiff also argues that the landing of the concrete ramp
3  leading East from the upper concourse of the South side seating down to the parking lot at the
4  East end of the Grape Bowl is less than 6 feet long and that since 2007 California Building Code
5  has required ramp landings at a change of direction to be a minimum of 72" long.  (ECF No. 27-1
6  at 15–16.)  Finally, Plaintiff asserts that the asphalt ramp from the East parking lot to the upper
7  South side concourse level has slopes that exceed the maximum 8.33% as allowed by ADAS
8  section 405.2, and lacks handrails on both sides as required by ADAS section 405.8 as well as
9  level landings for each 30" of vertical rise, as required by ADAS 405.6.  (ECF No. 27-1 at 16.)

Defendants assert that the South side of the stadium is fully ADA complaint.  (ECF No. 29 at 5.)  Mr. Hood's sworn declaration states that in 2010 the City of Lodi embarked upon extensive projects to make the facility ADA compliant.  (ECF No. 29-2 at ¶ 2.)  The declaration and its attachments detail the three phases of construction and inspections and thus purport to show that the alterations are ADA complaint:

> Phase I of the plan consisted of demolition of two restroom/concession stand buildings, miscellaneous other structures, concrete flat work, concrete footings, wood pole light standards, backfill of footings, site grading, installation of Americans with Disabilities Act seating and access for eight, other incidental and related work. . . [A] a true and correct copy of the City of Lodi Resolution accepting these improvements, including the inspection history showing these improvements are in compliance with the ADA.
>
> Phase II consisted of the installation of an all-weather playing field, new steps and ramps from the field to the bleacher area, an 18 inch concrete curb, and a sidewalk path of travel along the north and south sides of the field and to the handicapped parking area.  The final contract price was $848,638.84.  Attached as Ex. B (LODI000385-215 to LODI000385 - 221) is a true and correct copy of the City of Lodi Resolution accepting these improvements, including the inspection history showing these improvements are in compliance with the ADA.
>
> Phase III was the most extensive. It consisted of an Americans with Disabilities Act (ADA) accessible ramp to the south-side upper concourse; ADA seating at the south-side upper concourse; concrete plaza area; concession, restroom and ticket building; landscape; irrigation and other related facilities.  It was completed on August 22, 2013.  The final contract price was $1,635,164.41.  Attached as Ex. C (LODI000385-334 to LODI000385 - 339) is a

>> true and correct copy of the City of Lodi Resolution accepting these improvements, including the inspection history showing these improvements are in compliance with the ADA.

(ECF No. 29-2 at ¶¶ 3–5.)  Defendant and Plaintiff have presented contradicting evidence concerning whether these alterations are ADA complaint.  (*Compare* Bishop Decl., ECF No. 27-5 at 26, *with* ECF No. 29-2 at ¶¶ 3–5.)  Therefore, at this junction, material issues of fact prevent this Court from granting summary judgment as to either party on these issues.

### B.  Unruh Civil Rights Act and California Disabled Persons Act ("CPDA")

Plaintiff and Defendant have also moved for summary judgment as to Plaintiff's Unruh Civil Rights Act claim.  The Unruh Civil Rights Act provides that "a violation of the right of any individual under the Americans with Disabilities Act of 1990 shall also constitute a violation of this section."  Civ. Code § 51 (f).  "A violation of the ADA is, by statutory definition, a violation of both the Unruh Act and the [C]DPA."  *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1023 (N.D. Cal. 2012). "Because the Unruh Act is coextensive with the ADA and allows for monetary damages, litigants in federal court in California often pair state Unruh Act claims with federal ADA claims."  *Molinski v. M.J. Cable, Inc.*, 481 F.3d 724, 731 (9th Cir. 2007).  Likewise, Plaintiff's CPDA claim relies on the same ADA violations that this Court has previously discussed.  *See Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 675 (2009) ("As to ADA violations, the overlap [with the CPDA] is plainly deliberate, the Legislature having specified that ADA violations are also violations of both the Unruh Civil Rights Act."); *see also Rodriguez v. Barrita*, Inc., 10 F. Supp. 3d 1062, 1074 (N.D. Cal.), *reconsideration denied*, 62 F. Supp. 3d 936 (N.D. Cal. 2014) (applying *Munson*).

Because both the resolution of Plaintiff's Unruh and CPDA claims are dependent on Plaintiff's success on his ADA claims, the Court cannot adjudicate this matter due to material issues of fact.  Thus, both Plaintiff and Defendant's motions for summary judgment as to these claims are denied.

### IV.  CONCLUSION

Based on the foregoing discussion, there are material issues of fact as to whether Plaintiff

16

can show ADA violations based on barriers in the North side pathway as well as the alleged ADA violations on alterations that were made to the South side of the facility in 2010.  The material issues of fact also affect Plaintiff's Unruh and CDPA claims, as these claims are based on ADA violations.  Thus, summary judgment as to either party is inappropriate at this time, and the Court

///

hereby DENIES Plaintiff's motion for summary judgment (ECF No. 27) as well as Defendant's cross-motion for summary judgment (ECF No. 28).

IT IS SO ORDERED.

Dated: June 9, 2016

Troy L. Nunley
United States District Judge